The next case is Emengo v. Stark. Good afternoon, Your Honor. May it please the Court. Sam Madwebuna, and with me is William Coles. We represent Mr. Emengo, a black man who was born and raised in Nigeria. In this case, Mr. Emengo appeals the decisions of the District Court denying his motion for leave to amend his complaint to add additional defendants who participated and were personally involved in discrimination and retaliation against him. He also appeals the decision denying his motion for reconsideration of the denial of his motion for leave to amend. And finally, he also appeals the grant of summary judgment in this case on the grounds that the defendants, the remaining defendants, the only defendants in the case were not personally involved. We believe that the Court applied the incorrect standards in considering all three motions and we are asking this Court to reverse and remand the case back to the District Court. Mr. Emengo is admittedly an exemplary employee. He has a long history of over 26 years of working for the New York State Insurance Fund. He is considered an excellent employee by all accounts. He was recommended for promotion by the former director of a division of New York State Insurance Fund known as the Division of Confidential Investigations, or DCI. That promotion was, that recommendation was made in 2010, but it was never implemented. Instead, it was implemented as to a white employee, Mr. Desenso, who was the deputy director. Without justification, we believe the defendants in this case and others refused to have Mr. Emengo become the deputy director in DCI because of his race and because of his national origin. We believe also that prior to that recommendation and denial of promotions in 2017, that Mr. Morlin told Mr. Emengo, that as an immigrant, that he was lucky to have his position, his position at that time being that of a supervising investigator, which was a fairly high position within DCI. The defendants in this case, Ms. Stark, Ms. Morlin, are high level executives within DCI, and they were involved in making decisions. The testimony that came out from all the testimony and all the documents that we have show that the decision as to whether to, in fact, promote ultimately goes to the executive, the executives, and the executives include Mr. Morlin, includes Ms. Stark, and includes orders. So to that extent, they were involved. The reason why... What is the evidence that you rely on that he played, I mean, I think your adversary says he played essentially a ministerial role in posting notices and the like. So what is the evidence on which you rely that he did more than that? You know, first of all, personal involvement is an issue of fact, and you cannot just rely on the testimony of Mr. Morlin that he says, oh, this is all I do, otherwise, you know, we'll never get to the truth of the matter. The fact of the matter is that the record is replicated with acts that he does in connection with promotions. One, he is involved in making sure that people are promoted. In 2008, for instance, in connection with the same Mr. Emengo, Mr. Emengo's supervisor then, Mr. Lapointe, the same Mr. Lapointe, that recommended that he be promoted, wrote him an email and said, hey, why are you trying to push other promotions forward when you have not addressed the promotions of Mr. Emengo and Mr. Brantley and a black man that are recommended for promotion? And that is what we find in the record in A1039. That's an email from Mr. Lapointe, you know, to Mr. Morlin. Mr. Morlin was involved in promotions during the relevant period. He is the one that is consulted regarding candidates. He reviews resumes. He advises about possible salary ranges. All of these facts show that if Mr. Emengo is to be considered for any position within DCI, Mr. Morlin has to be involved. That's an inference that a jury can draw based on the record. Besides, he had a duty by his own admission to make sure that the policies are followed, the policies, including the anti-discrimination policies are followed. He knew that Mr. Emengo was recommended for promotion going back in 2010. He knew it all along at every point in time. He did nothing. He did not say to anyone, hey, Mr. Emengo was recommended. What was going on with Mr. Emengo? Instead, what did he do? He knew that Mr. Tidona, for instance, which is one of the positions that we challenge, was applied for a director position, but they hired him into a director position, which is an anomaly. He knew that Mr. Doming, who was another director that was hired, there was no posting, yet he was selected and placed in that position disregarding the strong recommendation of Mr. Lapointe for the promotion of Mr. Emengo. I recognize that you point to the comment made by Mr. Mullen about be content you're an immigrant. As I understand it, that was in 2007. Is that right? That is correct, Your Honor. The promotions that you contest now were in 2013 he was interviewed and 2014, which seems somewhat remote. I'm wondering what else, because you've had extensive discovery here. This is a summary judgment. We're not at a motion to dismiss phase. I wonder what else you would point to other than general circumstances that a white man got the directorship and the deputy directorship was left open for a period. What else is there in the record that suggests that any individual of those named or those proposed to be named as a defendant had any discriminatory intent? Let me just go back and say that since Mr. Emengo was recommended for this promotion, there was a continuing effort by these defendants to prevent him from being promoted. It starts from 2010 when he was recommended all the way to the present. At every point in time, they will not move forward with his own promotion. In 2013, as a matter of fact, he sued and he has a lawsuit in state court for the positions that he was passed over for in 2010 and 2012. What has happened to that state court? It is still pending, Your Honor, against all the individuals, including Mr. Marlin and also Ms. Stark, for that position, not for the ones in this lawsuit. Now, there is evidence on the record that no black man has ever been promoted to be a director or deputy director within DCI. There is also evidence that Mr. Emengo was allowed, despite not pushing forward his recommendation, to continue to act as deputy director when there was no deputy director and director when there was no director. In the face of women's qualifications and... I'm not answering the question that Judge Carney asked you, which is what acts, in addition to that statement that, you know, you should be content because you're an immigrant, what are the other acts that these individuals, three of them or the six of them, did that demonstrates a discriminatory intent? Yeah, those acts... This is the universe you're talking about. No, I am saying, Your Honor... You say this about a lot of places, a lot of organizations, what you just said. I think her question concerns, and I would be concerned to know, what these individuals did specifically. Give us the name and then tell us what they did. What they did, Your Honor, I think I'm answering the question, what they did, Your Honor... No, the individuals. Give the name of the individuals. Yes, both Stark, both Mollen... No, just start with what? Well, Mollen did not push for his promotion. He did not. So it's not that he did something, it's that he didn't do something. He did not, yes, and he's required to do one. Two, he knew there was ongoing discrimination against Mr. Emengo. He knew what? There was ongoing discrimination against Mr. Emengo, for which he complained. How do you know that? Where in the discovery did you find that? There is a lawsuit, there is a complaint that he made in 2012, in November of 2012, in which he specifically told Ms. Curry, which is one of the defendants we are trying to add, that he was being discriminated against by Ms. Stark, Mr. Mollen. He was being discriminated against by Ms. Stark, Ms. Mollen, and others. There was a complaint that he made in 2012. Who made? Mr. Emengo. Yeah, I know, but that's your client's position. We know his position. I think the question is, what did these individuals do, apart from that statement six, seven years ago, that, you know, be satisfied that you're an immigrant. What did Mr. Mollen do, for example, in addition? Mr. Mollen, Mr. Mollen did not. One, just take one at a time. He did not push for Mr. Emengo to be promoted. One. Two, he did not act. He had an obligation. To do that. He did not push for Mr. Emengo's promotion. That is correct. Two, he did not, as an executive, recommend that Mr. Emengo be promoted. He did not do that. Three, he knew that Mr. Emengo was complaining that his failure to promote him, or recommend him for promotion, or push a recommendation, was discriminatory and ongoing. He knew that because there was a lawsuit against him in 2013. You're just saying he knew that your client was making that claim. Yes. I'm trying to figure out the things that he did. So far you've got just the things that he didn't do, but you're saying he was obliged to do. Promote him or recommend him for promotion. That's it? Well, yes, Your Honor, and if you look at the facts, yes. No, no, I'm just trying to be specific. That's it. That's it. He knew, and he had a duty himself, given his position as director of administration, to make sure that if there was ongoing discrimination, that he does take action to make sure that it is not happening. He did not do that, and that's an element of personal involvement under Section 1981. If you knew there was an ongoing act of discrimination. With respect to your client or everybody? With respect to anybody, yes. And he admits that he knew that Mr. Mingo was making this complaint and that he had not been promoted. He had been recommended, and then he did nothing. Ms. Stark was an executive. Was what? She is an executive, a highly placed executive responsible for DCI, the area in which Mr. Mingo worked in. What did she do that was discriminatory? She did not, like Mr. Morland, act on the recommendation. And we believe that she did not act on the recommendation for discriminatory reasons. No, but it's not what you believe. I want to know what she did that gives rise to inference that was discriminatory. What did she do? Yes. The inference, what leads to the inference of discrimination here is that they knew of the background of Mr. Mingo. They knew about his lawsuit. I know that, you know. No, beyond his lawsuits, they knew about his excellent performance. They knew about his background. They knew that he was recommended. They failed to act on it, and they were the ones making decisions as to who to be promoted. You're saying he was actually entitled to one of those jobs. He was, absolutely. As a matter of law, right? Not as a matter of law. He had to have been promoted to one of those. That's what you're saying. No, what I'm saying, Your Honor, is that he had already shown through his performance and through the recommendation that he was in a position to assume those positions. I get it. He didn't get it. You're saying that he was entitled to one of those two jobs. No, not necessarily. He's entitled to be considered, and he was not considered for discriminatory reasons. He was recommended. He acted in those positions when there was a vacancy. I'm still asking the same question as what those people did specifically and individually that gives rise to a discriminatory attack. Other than, I guess you're saying that they didn't put him in the job. Correct. And they were obliged to. They were required to at least consider the recommendation, act on it. They did not. The record is devoid of anything that they did. And, Your Honor, quite frankly, it strains credulity for this executive to say that they did not know who made decisions. That's what the record is showing. Their testimony is that we don't know who made the decision. Oh, it is Francine James, or it's somebody else. They keep passing the buck. And that is what actually led to the issue of who do we sue. We did not have enough evidence as to who to sue, ultimately, until after this query was done and we made a motion to amend. I have other points, but I think our briefs, you know, delayed a bit. If you'll allow me, I can continue. Otherwise, I'll wait and answer. We'll hear you on rebuttal. Okay. Thank you. May it please the Court. Linda Fang on behalf of the individual defendants, Appelese. This Court should affirm the judgment. As the questioning to my adversary led up to my presentation here, there really was no triable issue of fact as to the personal involvement of any of the individual defendants in this case. Can you address that with regard to Stark? I mean, she was deputy executive director. She says in her declaration that she no longer had direct oversight of DCI in 2013, but she had general supervisory responsibilities. I was trying to figure out whether she was a member of the executive staff, or at least there's a question in my mind, whether she participated in the 2013 decision to hire Mr. Tadona. There's no disputed material fact on that issue, Your Honor. You said what? There is no disputed material fact on that particular issue, and if I could elaborate. What does that mean? That means that although Ms. Stark was a member of the executive at the time, broadly construed that term. Here we have 1981 and 1983 claims, and this Court's precedents consistently require more than just being up on the chain of command. So the relevant question for purposes of her liability personally in her individual capacity was did she play a decision-making role with respect to the challenge employment actions in this case? So being a member of the executive or being the head of an agency does not automatically impute. There's no Title VII claim here? What does the record show about who made the decisions? The record- I was struck by the recommendations that were made by the departing director and the fact that over time the deputy director position was not filled and that Mr. Emengo had consistently, as I understand, strong reviews. And I find it difficult to tell exactly who made the decisions. It's a bureaucracy whose titles aren't so transparent. So could you tell me what the record says about who made the decision as to the appointment of the director in 2013 and the decision not to appoint a deputy director for an extended period of time? So with respect to the actions that are challenged in this case, not the state court action, which are the 2010 actions here, the record is clear that Dorothy Carey was the chief of staff at the time at the State Insurance Fund, and she has unequivocal testimony that she approved the recommendation that was made by Peter Cusick and Robert Sammons, who were the interviewers. Robert? Robert Sammons. And those were the two individuals who interviewed Mr. Emengo for the director and the deputy director positions in September of 2013. The record is clear on that. Both Mr. Cusick and Mr. Sammons said they made a collective recommendation higher up at the chain, and maybe Mr. Sammons wasn't clear on who particularly was the specific individual who maybe signed and approved the recommendation, but they recommended Mr. Chidona, who had extensive experience as an outside candidate investigating complex fraud, to receive the director position. And the record is clear on those facts. And there is no evidence whatsoever that Mr. Mullen or Ms. Stark played any role in that decision because we have Ms. Carey and Mr. Cusick who said, yes, I sent the recommendation up and it was approved, and Ms. Carey said, yes, I approved that recommendation. It's just silent as to whom that recommendation was made and who made the decision. I think the record speaks to that Mr. Cusick recommended that Mr. Chidona get the second round interview, and after that interview, which was conducted by Ms. Carey and Mr. O'Brien, Ms. Dorothy Carey was the one who said, I approved this, and then sent it up the chain to the governor's office. I believe the deposition testimony is clear on that. So that is the body of the individuals who were involved in connection with the challenged director appointment in this case. And with respect to the- Would you say, in summary, which of the individuals made that decision? All four of those that you just mentioned? Were they involved in that decision? I think the record is that Mr. Sammons, Mr. Cusick, and Mr. Carey were the ones who were directly involved, and I think Mr. O'Brien was a person who sat in on the second interview, but not everyone who necessarily sits in on an interview participates in the decision-making process. I don't know about everyone, but what did he do? He was at the interview table. He was at the interview table. Would it be fair to say that those four people made that decision? They were the ones who participated in the decision-making at the agency. Nobody else? There is nothing in the record to suggest otherwise. So there's four people, right? That's what the record suggests. Okay. And what about the decision to keep the deputy position vacant for an extended time? So Mr. Cusick's testimony was that the decision was made to let the director come in and let the director have some input in the decision-making, and that testimony was consistent with Mr. Tadona's testimony, that once he came in as director, they did interview individuals for the deputy director position, but they just other matters took precedence and they did not get around to filling that position. So I think they're – Wait. So just to be specific again. So it's Cusick alone is responsible for not promoting the plaintiff to that position. He's saying let's leave it open. Or Mr. Tadona. Yeah. Or Mr. Tadona. Yes. That is what the record indicates. There's a two-part decision-making here is that Mr. Cusick did not – Mr. Cusick and Mr. Sammons did not recommend anyone to move forward for the deputy director position, and Mr. Cusick also testified at his deposition that part of the thinking was let's let the director come in and have some input in who would be his or her second-in-command of the unit. And that's all that there is in the record as to why the deputy director position was not filled immediately. And Mr. Tadona said, yes, we interviewed folks and we were in the position of trying to select someone, but we just did not get around to filling that position. Has it been filled now? I thought it was still not filled. And, in fact, I think Mr. Emengo says that he's functionally doing those, you know, the tasks that otherwise would fall to the deputy, but he doesn't have the title. There was an acting deputy director for a period. I believe the current position, there is a new director in place, so Mr. Tadona is no longer the director as well. So there have been some personnel changes, and as far as I know, that position is not yet filled. Did Mr. Emengo ever do those duties? I'm sorry? Did the plaintiff ever do those duties of the position that was not filled? I don't think the record is clear as to that. There is some allegation that he performed additional duties, but whether or not he was entitled to receive the position or, I guess, more. I'm not getting to he's entitled to. I'm just trying to understand if he, in fact, in fact, even though he wasn't called that, undertook the duties of the deputy. We don't know. That's not in the record? I'm sorry? That's not in the record? That's not in the record. That fact issue was not developed and was not raised below as to whether or not he functionally was performing. There's the allegations that he was, but it's not material to the issues here. And if I could just briefly sum up to talk about, you know, it's one thing whether or not someone was. Employers make decisions on employment matters for a variety of different reasons. But what is also missing here, aside from the personal involvement issue, which is only one element of what plaintiff would have to satisfy, there was no tribal issue as to whether or not any of the challenge employment actions here were taken for discriminatory reasons or for retaliatory reasons. And that is also an element that plaintiff needs to carry forth. And as the district court pointed out, in fact, the addition of the additional proposed defendants here would have added nothing to his claims because all we have is an alleged remark that's disputed that was made in 2017, six years before. 2007. Yeah, I'm sorry. I've made this mistake before. 2007, that's correct. Six years or seven years before the challenge employment actions here. Under this court's precedent, that's a classic stray remark. And we have individuals here on individual liability. So whether or not Mr. Mullen may have made that remark, if he did not participate in these employment actions here, those remarks are not going to be construed to the actual decision makers here. And there's absolutely no evidence. And plaintiffs had ample opportunity both in the motion for reconsideration and on summary judgment where we raised all of these issues, that there was no triable fact as to discriminatory or retaliatory animus. Motivating any of these challenge decisions, plaintiffs had ample opportunity to bring all whatever factual discovery, and there was extensive discovery here, any of those issues up for consideration with the district court. In fact, the district court found in the summary judgment motion there was no evidence. And adding those additional defendants would not have added anything to his claims. And if the court has no other questions, we ask you to affirm. Just starting from the last point, the court below did not even get to the issue of Did not what? Did not get to the issue of discrimination. The court's decision below was that the individuals that were sued, Mr. Mullen, Ms. Stark, and Mr. Tedona, were not personally involved. That is the decision. And as I said earlier, the issue of personal involvement is a question of fact. It's a question of fact. A jury has to look at all the circumstances to determine whether, in fact, they were involved. The record is clear that it is not clear who made the ultimate decision here. There is testimony from Mr. O'Brien that the decision, the decision to fail the director position, was based on a recommendation to the executives who were the final decision makers, and that includes Mr. Mullen, that includes Ms. Stark, for the director position. Secondly, Ms. Carey's testimony is that a referral was made to him by the interviewers, in this case Mr. Simons and Mr. Cusick, and ultimately the executives acted on it and then took it forward. Our position, Your Honor, is that if this case is allowed to go forward, a reasonable jury will find that Mr. Emengo, who had already been recommended, and the practice in this department is that if you are recommended, automatically you get the position. In this case, the black man was recommended. He did not get the position. They did not act on the recommendation. And they knew he had been recommended. They knew that he had been doing the job. Council, contrary to what council said, the record is clear that Mr. Emengo, from August 2010 to July 2012, acted as deputy director for DCI after Mr. Lapointe resigned and Mr. DiCenso became the director. And after Mr. DiCenso retired in July 2012, he acted together with Sal Diogadi as co-directors for DCI from July 2012 to June 2013. Your Honor, the point that we are making here is that on this record, it is wrong for the court to rule as a matter of law that these individuals are not personally involved, where, by their own testimony, they were covering who actually made the decision in an attempt to avoid liability. This is a quintessential issue of fact that goes to a jury. We ask this court to return this case to the court below for it to be tried before a jury. Thank you. Thank you both, and we will take the matter under advisement. That's the last argued case on the calendar. We have two submitted cases which I've already identified, so I'll ask the clerk to adjourn court. Court is adjourned.